# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

—o0o—

| | | |
|---|---|---|
| RAYVAUGHN ROYCE EMBRY, | ) | 1:04-CV-06101 AWI JMD (HC) |
| | ) | |
| Petitioner, | ) | FINDINGS AND RECOMMENDATION |
| | ) | REGARDING PETITION FOR WRIT OF |
| v. | ) | HABEAS CORPUS |
| | ) | |
| | ) | |
| G.J. GUIRBINO, Warden, | ) | [Doc #1] |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This action has been referred to this court pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72-302.

## PROCEDURAL HISTORY

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, Case No. SC08347A.

Following a jury trial, Petitioner was convicted of second-degree murder (Cal. Penal Code §187(a)) and one count of possession of a controlled substance (Cal. Health & Safety Code

1

1   §11377(a)).  Petitioner was sentenced to a total state prison term of fifteen years to life, plus four

2   years.  Respondent's Answer, Exh. 1 (Abstract of Judgment).[1]

3          On February 25, 2003, Petitioner appealed to the California Court of Appeal, Fifth

4   Appellate District (hereinafter "Fifth DCA"), case no. F041024.  Exh. 2.  In an unpublished

5   opinion dated March 26, 2003, the Fifth DCA affirmed Petitioner's conviction.

6          Following the decision of the Fifth DCA, Petitioner petitioned the California Supreme

7   Court for review on April 29, 2004.  Review was denied on June 23, 2004, case no. S124451.

8   Exh. 4.

9          On August 16, 2004, Petitioner filed the instant petition, alleging two grounds for relief:

10  (1) improper admission of statements elicited in violation of Petitioner's *Miranda* rights; and (2)

11  error in denying Petitioner's motion for a change of venue.

12         On January 31, 2005, Respondent filed an answer to the petition, and on February 18,

13  2005, Petitioner filed a Traverse to Petitioner's Answer.

14                            **FACTUAL BACKGROUND**

15  The Court adopts the facts as recited by the Fifth DCA in its opinion dated March 30, 2004:

16          In December 2001, Jennifer Soto was 26 years old and lived in The
        Springs, a very large apartment complex in Bakersfield which consisted of
17      multiple two-story units.  Her two-bedroom apartment was on the first floor.
        There were sliding glass doors in the master bedroom and the living room which
18      opened onto a small patio.  There was a small closet on the patio which contained
        a washer/dryer unit.  A lattice fence surrounded the patio's border, and the fence
19      was four feet high.
            Jennifer had lived in the apartment for almost one year.  Brandy Gentry
20      was her roommate .  No or else lived in the apartment with them.  Gentry testified
        that Jennifer often slept on the living room sofa instead of her bedroom.  Gentry
21      also knew that Jennifer kept a loaded gun in the apartment.
            Gentry testified that Jennifer and appellant were good friends.  Jennifer
22      called appellant her best friend, and they spent time together at Jennifer's
        apartment.  Gentry testified appellant treated Jennifer well and provided support
23      for her when she needed it.  Appellant was unemployed, and he lived with his
        grandmother on Cochran Drive in Bakersfield.
24          Jennifer drove a dark green Honda sedan and kept it in the apartment
        complex's parking lot.  Pat Kinnikin, appellant's friend, had frequently seen
25      appellant use the green Honda.  Appellant told Kinnikin the car belonged to a girl
        he was dating.  Kinnikin never met the girl and didn't know her name, and he
26      didn't know Jennifer.

27  ───────────────

28  [1]All subsequent exhibit references are to the exhibits attached to Respondent's Answer, unless otherwise
    noted.

ed

Saturday, December 15, 2001

On the afternoon of Saturday, December 15, 2001, Jennifer joined her aunt, Ellen Eggert, and other family members as they moved furniture from her grandmother's house to Jennifer's apartment. Jennifer was very close to Eggert and they saw or spoke to each other almost every day. This event, however, was the last time that Eggert saw Jennifer. Michael Carroll and Ron Hemphill, Jennifer's brothers-in-law, loaded Carroll's truck with a couch, a chair, and an ottoman, and left for Jennifer's apartment. During the drive, Jennifer called appellant on her cell phone, said they were on their way to the aparmtent, and asked him to help unload the furniture.

When they arrived at Jennifer's apartment, appellant was standing in the parking lot. Jennifer introduced appellant to Carroll and Hemphill, and said appellant lived in another apartment in the same complex. Appellant helped them move the furniture into Jennifer's apartment. Jennifer left with Carroll and Hemphill but appellant remained in her apartment. As they drove away, Jennifer called her apartment and asked appellant if she left her purse there.

Eggert spoke with Jennifer once or twice on the telephone during the following week. Jennifer did not seem different.

Wednesday, December 19, 2001

On Wednesday, December 19, 2001, Brandy Gentry and Jennifer had an argument at their apartment. Gentry had hidden $500 in her bedroom to pay the rent, and only Gentry and Jennifer knew where the money was hidden. Gentry discovered the money was missing and confronted Jennifer. Gentry demanded to know what happened to the money, but Jennifer didn't respond. At some point between 4:00 p.m. and 5:00 p.m., Gentry packed up her belonging and moved out, and she never saw Jennifer again. Jennifer tried to call Gentry later that night, but Gentry had turned off her cell phone and she didn't know that Jennifer was trying to reach her.

On the same day, Ellen Eggert called Jennifer's cell phone and didn't get an answer. Eggert left a message but Jennifer never called back.

Around 4:00 p.m., Michelle Copeland called Jennifer and offered her a business propossition. Copeland ran an adult entertainment service and needed to find someone to perform an exotic dance that night. Copeland couldn't find anyone and asked a mutual friend, Patrick Burks, for recommendations. Burks had previously introduced Copeland to Jennifer, and suggested that Copeland offer the job to her. Copeland called Jennifer and aksed if she was interested in the job. Jennifer said she was willing to give it a try and accepted the offer. Copeland gave the customer's name and address to Jennifer, and instructed Jennifer to call her when she arrived and left the customer's house.

Around 9:00 p.m., Jennifer arrived at Gary Glenn's residence in Bakersfiled to perform the exotic dance, and called Copeland to tell her that she was there. Jennifer arrived alone and carried a knapsack-type bag. Glenn testified they had a drink and talked. Jennifer danced, took off her top, and stripped down to her underwear. They did not have sex or use drugs. Glenn thought Jennifer seemed naive and shy, and Jennifer said that she was just getting into this type of business. Glenn paid her $200 and asked if he could see her again. Jennifer seemed interested and gave her telephone number. Jennifer called Michelle Copeland and said she was leaving. Glenn testified that Jennifer left his house between 10:00 p.m. and 11:00 p.m. Glenn testified he called Jennifer a couple of times in the following days and left messages on her answering machine, but she never responded.

Thursday, December 20, 2001

Around 2:00 a.m. on Thursday, Jennifer called Patrick Burks because they were supposed to get together that night. Jennifer apologized and said she had fallen asleep on the couch at her apartment, and she would be right over. Jennifer

arrived at Burks' house around 2:30 a.m. and said she had seen someone that evening. Jennifer gave $150 to Burks for getting her the job that night. Burks and Copeland were supposed to split the fee but Burks kept it because Copeland owed him money. Burks testified Jennifer stayed at his house for several hours and they talked. They did not drink or use drugs. Jennifer left between 6:30 a.m. and 6:45 a.m. Burks testified that Jennifer called him around 7:30 a.m., and that was the last time he talked to her.[2]

Later on Thursday, December 20, 2001, Ellen Eggert again called Jennifer's cell phone and left another message, but Jennifer never called her back.

Also on Thursday, appellant unexpectedly arrived at Vincent Arias's house in Jennifer's green Honda. Arias believed appellant arrived between 11:00 a.m. and 12P00 p.m. Arrias wasn't sure about the time, however, and thought appellant arrived no later than 2:30 p.m. Arias testified appellant had never visited him before, and they were just acquaintances rather than social friends. They knew each other because appellant had previously been a cab driver and frequently picked up Arias at his house. Arias was not expecting appellant and had been leaving when appellant arrived.

Arias testified appellant repeatedly asked Arias to follow him and give him a ride. Appellant said he wanted to get rid of the car and needed to get it back. Appellant didn't say who the car belonged to. Arias had a suspended driver's license and said no. Appellant asked if Arias's aunt could give him a ride, but the aunt's car was not in working condition. Arias testified that appellant left after 15 to 20 minutes because no one could give him a ride. Appellant didn't use the telephone at Arias's house. Appellant was wearing a long sleeve shirt and dark blue or black pants, and his clothes seemed pretty new.

Arias testified appellant was impatient and appeared to be in a hurry to drop off the car. Arias noticed appellant's pupils were dilated and larger than usual, he made rapid hand movements, he talked fast, and he was not as calm as he usually appeared. Base d on his own prior use of narcotics, Arias believed appellant was under the influence of methamphetamine. Appellant acted paranoid, "like there was something more than just, you know, he needed a ride to drop off the car."

At some point between 4:00 p.m. and 4:30 p.m., appellant arrived at Patrick Kinnikin's house and he was driving the green sedan. Kinnikin recognized the car because appellant had used it before. Kinnikin and his friends were about to leave for happy hour at a restaurant, and appellant asked to join them. He also asked Kinnikin to follow him so he could drop off the car, and Kinnikin said yes. Kinnikin said they intended to leave for the restaurant in a few minutes, and appellant said he had to go to the store to buy cigarettes. Appellant was at Kinnikin's house for five or 10 minutes before he went to the store, and Kinnikin didn't know if appellant used his telephone. Sometime between 4:40 p.m. and 4:50 p.m., Kinnikin and his friends left for the restaurant without appellant, who hadn't returned from buying the cigarettes.

Kinnikin testified appellant arrived at the restaurant about 5:10 p.m. or 5:20 p.m. Appellant drank four or five beers and had a mixed drink, but he acted normal and didn't seem drunk. Kinnikin testified that appellant paid for his own drinks and even bought drinks for their friends, which was unusual because appellant rarely had any money. Around 7:00 p.m., the group was going to leave the restaurant. Appellant again asked Kinnikin to help him drop off the car at The Springs apartment complex and Kinnikin agreed.

---

[2]Burks was impeached with his prior felony convictions for insufficient funds and forgery.

Kinnikin followed appellant and they reached the apartment complex within five to 10 minutes. Appellant parked the car and walked to Kinnikin's truck. Appellant didn't go to an apartment or call anyone to report that he had returned the car. Kinnikin didn't see appellant with the keys and asked appellant if he was going to return them. Appellant replied he had his own set of keys and she had her own set. Appellant got into Kinnikin's truck and they returned to Kinnikin's house. Appellant stayed for a while and drank a few more beers. Kinnikin testified appellant left his house later that night with someone else.

Kinnikin testified he didn't know the name of the woman who owned the green Honda and never met her. Appellant told him that night the car belonged to the girl he was "sleeping or having sex with." Kinnikin testified appellant did not act unusual that evening.

Friday, December 21, 2001

On Friday, December 21, 2001, Marc Halling was painting the units at The Springs apartment complex. Around 8:00 a.m., he began painting the front doors to the individual units. He knocked on each door and, if no one answered, he used a master key to open and paint the front door, and he locked the door when he finished.

Halling testified that around 10:30 a.m., "give or take 20 minutes," he reached Jennifer's apartment to paint the door. He knocked and rang the bell but no one answered. Halling believed he used the master key to unlock the front door but he wasn't sure. He tried to swing open the front door but it was secured by the safety chain lock. He looked through the slight opening and saw the lights were on. He saw a big blanket on the couch and thought someone was sleeping under the blanket. He was startled and immediately closed the front door, and didn't paint that unit.

Around noon, Ellen Eggert drove to Jennifer's apartment to see what was going on. She had tried to reach Jennifer that morning but she couldn't leave a message on the apartment's answering machine because it was full. Eggert approached the apartment's front door, repeatedly knocked and called out, but there was no response. Eggert thought she heard music from inside the apartment and decided to try and open the door. Eggert discovered the door was unlocked but, like Halling, encountered the safety chain lock. Eggert could only open the door four to six inches.

Eggert looked through the small opening and saw blankets on the couch. Eggert knew Jennifer liked to sleep on the couch with blankets over her head, and initially thought she was just asleep. Eggert detected a strong odor, however, and realized it was similar to the odor she smelled on a previous occasion when she found her brother's body. She broke down the door and pulled away the blankets, and found Jennifer lying face down on the sofa, with multiple stab wounds all over her back. The blankets had completely covered Jennifer's body. Eggert was frantic to get help but couldn't find the apartment's phone. She found Jennifer's cell phone on the kitchen counter, called 911, and waited outside for the police to arrive. She didn't touch anything in the apartment.

The Scene

Several officers from the Bakersfield Police Department responded to the apartment and briefly spoke with Eggert. They entered through the broken front door and found Jennifer's body on the couch, completely covered by a blanket. They lifted the blanket and found several stab wounds on her torso. Her body was cold, her arm was stiff, and she did not have a pulse. The officers conducted a protective sweep and determined no one was in the apartment, and secured the area for further investigation.

Detective Jeffery Watts arrived at the apartment around 12:30 p.m. and evaluated the scene. Jennifer's body was lying face-down on a sectional sofa in the dining area. Her head was between the cushions and her right arm was by her

face.  She was laying partially on her left side and chest, and her right hand was curled under.  She had been stabbed with a knife approximately 30 times.  Her body was covered with two blankets, one of which was wrapped around her leg.  There were blood stains and approximately five knife-like cuts in one of the blankets, which suggested she had been stabbed through that blanket.  There were no cuts or blood stains on the other blanket.

Detective Watts testified it wasn't clear where she had been attacked but the assault ended on the sofa.  There were blood stains on the carpet adjacent to her body.  There was a lot of blood on the sofa, and two blood splatters on the wall directly behind the sofa.  The blood stains, however, were limited to the area on and around the sofa: there were no blood stains anywhere else in the apartment.

Detective Watts testified the apartment was clean and well kept.  There was nothing unusual inside except for the damage to the front door when Eggert broke through the safety chain.  There was a space heater in the dining room which was on full power and faced Jennifer's body on the couch.  Both the stereo and television in the living room were on, but the volumes on both devices were at minimal levels.  The porch light was also on.  There was a large chair with a large ottoman in the living room, with two remote controls on the ottoman.  The kitchen was fairly tidy.  The officers determined there were several messages on her telephone answering machine, and the messages were tape-recorded and preserved.

Detective Watts testified that based on the body's color and appearance, and evidence of rigor mortis, he believed Jennifer had been dead for more than several hours.  There was nothing missing from the apartment, nothing was disturbed or ransacked and there were no signs of a struggle near the body.  However, there were some things which had been moved in peculiar ways.  There was a coffee table just a few feet from her body, and the table had been angled toward the sofa.  There was an uncapped bottle of Power Aid on the table, and it still contained some liquid.  There was also a clock with a glass dome on the table.  Detective Watts testified these items would have been knocked over if Jennifer had been involved in a struggle.  Jennifer's purse had been tipped over on the sectional sofa adjacent to her body.  Some items from her purse were about one foot away, including her car keys, wallet, and license, but there was no cash in the purse.  It didn't appear that the contents had been dumped out during a struggle.  There was another purse near the front door which contained a loaded Smith & Wesson .32-caliber handgun.

Detective Watts determined the sliding glass door form the living room to the patio was the only unlocked entrance in the apartment.  The glass door had been closed but the inside lever was unlocked, and there was a golf club near but not in the door's track.  Watts believed the killer left through this door because all the other entrances to the apartment had been locked, and the sliding glass door could not be locked from the outside.  The front door had been locked with a safety chain until it was disturbed by the painter and Jennifer's aunt.  The window in the second bedroom and the sliding glass door in the master bedroom were locked and undisturbed.  There were wooden spoons and a golf club in the track of the bedroom's sliding glass door to prevent it from being opened.

The police found Jennifer's green Honda parked near the apartment.  One door was unlocked, and the vehicle was secured and subsequently searched.  The officers found the car keys in Jennifer's purse; there was no car key in the vehicle.

Friday afternoon and evening, December 21, 2001

Around 3:00 p.m. on Friday, appellant contacted Kim Navarro and asked if she wanted to spend the night with him, and she agreed.  Appellant and Navarro occasionally dated.  Navarro didn't use drugs and appellant never used drugs in front of her.

Around 7:00 p.m., Navarro picked up appellant at Pat Kinnikin's house

ed

and they drove to a motel.  Appellant opened his wallet and gave $20 to Navarro to split the room rate.  Navarro was surprised to see more cash in appellant's wallet, because she knew he was unemployed.  Appellant walked to a nearby fast-food restaurant and spent $10 to $15 on their dinner.  They ate dinner in the room and had sex.  Navarro testified she fell asleep around 11:00 p.m., and appellant was still awake and watching television.

Saturday, December 22, 2001

Kim Navarro testified they woke up at the motel around 9:00 a.m. and gathered their things to check out.  Appellant didn't mention anything about the previous evening's news.  As they were leaving, they saw Brandy Gentry, who had also spent the night at the motel.  Navarro went to the motel's office to check out while appellant stayed outside and talked to Gentry.

Gentry testified she had heard about Jennifer's murder on the news on Friday night, and asked appellant if he heard about it.  Appellant replied "yes."  Appellant said he had been at Jennifer's apartment on Thursday and left with her car around 8:00 a.m. or 9:00 a.m.  Gentry testified she was very upset about Jennifer, but appellant appeared to be blank or at a loss for words, and he did not cry or show emotion.

Navarro returned from the motel's office, and noticed appellant and Gentry were having a "serious" conversation but they stopped talking when she arrived.  Gentry told Navarro that she was "just telling [appellant] about Jennifer."  Appellant told Navarro to wait in the car and he would be there shortly.  Appellant and Gentry talked for a few more minutes until Navarro moved the car to their location.

Appellant got into the car and told Navarro he just learned from Gentry that his friend, Jennifer, had been found murdered.  Appellant told Navarro that he might have had Jennifer's car at the time she was murdered, based on what Gentry told him.  Navarro testified that appellant appeared to have just learned about her death from Gentry.  Appellant was quite and appeared to be in a state of shock or disbelief, but he was not outwardly upset.  He was not crying or yelling, and he did not appear fearful or scared.  Navarro testified appellant's reaction seemed odd, and she thought she would have reacted differently to hearing such news about a friend.  Navarro did not know Jennifer but appellant had talked about her before.

Navarro and appellant went to a drive-though restaurant for breakfast.  Appellant opened his wallet, pulled out some cash, paid for his food, and said he was almost broke or out of money "again."  Navarro again thought it was unusual because appellant was unemployed and did not usually have cash.  Navarro testified appellant did not appear to be under the influence of alcohol or a controlled substance, and did not show any unusual behavior.

The Autopsy

Jennifer had been stabbed with a knife at least 30 times, most of the wounds had been inflicted before her death, several of the wounds were fatal, and she died within minutes from internal and external bleeding.  The pathologist described the nature of the 30 stab wounds: "Some people die in a hail of bullets.  She had a hail of stab wounds."

Jennifer had been stabbed in her right shoulder area, the right side of her neck, the back of her right shoulder, the left side of her neck, the lower portion of her skull, the left front of her chest, the abdomen, and the hip.  There were two stab wounds in the center of her back, which were the deepest wounds in her body and had been made from right to left and were horizontal.  There were 14 wounds clustered on the right side of her body, some of which inflicted severe internal injuries to her chest and liver.  The wounds in the right shoulder perforated the body, extended upward into the neck, and hit the jugular veins.  The neck wounds were relatively superficial but caused profuse bleeding.  There were defensive

wounds on her left thumb, and small scrapes on her left wrist. There were scrape marks on top of her right foot, consistent with scratching the foot under the base of the sofa.

The pathologist testified Jennifer had been killed 24 to 30 hours before her body was discovered. Based on the condition of her body, she could have been killed between 8:00 a.m. and 9:00 a.m. on Thursday, December 20. It was impossible to determine the order in which the wounds were inflicted but she died in less than five minutes. The presence of the floor heater and the blankets would have hastened the decomposition period. The pathologist also believed the knife was four to six inches in length and Jennifer's blood would have been on the assailant, based on the nature and location of the wounds.

The pathologist testified Jennifer had used methamphetamine within six to eight hours of her death, and she would have been "crashing" from the high at the time of the murder. As a result, she could have been very tired or sleeping deeply when the assault began and unable to defend herself, which would have explained the minimal number of defensive wounds. She would have been startled by the attack and might have been able to throw up her left hand, which would account for the single defensive wound. Some of the wounds could have been inflicted while she was lying on her stomach.

Jennifer had been fully clothed in a white shirt and blue shorts. A sexual assault examination indicated she didn't have sexual intercourse within 72 hours of her death.

The Investigation

Detective Watts testified there were no suspects when he started the investigation. He contacted and interviewed Jennifer's family, friends, and known associates. He formed a contact list from the names and telephone numbers found in Jennifer's cell phone, using the cell phone's telephone directory and the record of incoming and outgoing calls. Detective Watts questioned several people about their relationships with Jennifer, and tape-recorded some of the interviews. Appellant's name and telephone number were in the cell phone's directory. He also examined the messages on Jennifer's answering machine and found two consecutive calls from appellant. There were no time or date stamps on the answering machine.

Watts learned from Brandy Gentry that appellant was Jennifer's best friend. Watts used the telephone number on Jennifer's cell phone and tried to contact appellant but no one answered. He left several messages on an answering machine but no one returned the calls. Ellen Eggert found appellant's name and another telephone number on a paper in Jennifer's apartment and gave the information to Watts. Watts used that number and tried to contact appellant but was unsuccessful. Watts obtained appellant's address and determined he lived on Cochran Drive in Bakersfield

On December 28, 2001, the criminalist advised Detective Watts about the fingerprints found in Jennifer's apartment and car. Appellant's prints were on the interior of the living room's sliding glass door, a white notepad in the kitchen, and a white bowl on the coffee table near Jennifer's body. Jennifer's prints were also on the white bowl. There were partial palm and fingerprints on the patio railing, consistent with someone standing on the patio and touching the railing, but the prints did not match appellant. There were fingerprints inside Jennifer's car but none of the prints matched appellant, and there was no blood in the car. The criminalist specifically looked for a car key but never found one in the car.

On December 29, 2001, Detective Watts used the caller-identification feature on Jennifer's cell phone to backtrack her most recent calls. Watts called one number and the telephone was answered by Pat Kinnikin. Kinnikin said he didn't know Jennifer but he would find out who used his telephone to call her.

Kinnikin testified he asked everyone he knew, including appellant,

whether they knew Jennifer and called her from his telephone.  Appellant told Kinnikin that he knew Jennifer, and Kinnikin gave him Watts's telephone number.  Kim Navarro learned about Pat Kinnkin's contact with the police, and encouraged appellant to call the police.

On Sunday, December 30, 2001, appellant left a message on Detective Watts's voicemail at the police department.  Appellant said that he learned Watts wanted to talk to him about Jennifer Soto and would be happy to answer any questions. Appellant gave his address, and his home and work telephone numbers. On Monday, December 31, 2001, Watts retrieved his voicemail and heard the message.  He returned appellant's call but couldn't reach him at either number.

ON January 2, 2002, Detectives Watts and Krueger drove to appellant's residence to try and contact him.  Appellant answered the door and said he would be happy to talk to them about Jennifer.  The detectives intended to question him at the house, but appellant suggested they talk at the police department.  He asked them to wait while he got dressed, and he asked for a ride to the police department.  While they were waiting, however, the detectives received a call on an unrelated case and had to leave.  They told appellant they would return in a few hours.  Watts testified appellant was not a suspect and they never would have left him at the house if he had been a suspect.  The detectives returned about two hours later and drove appellant to the police department.

Appellant's Interview

Detectives Watts and Krueger interviewed appellant at the police department, and the interview was tape-recorded.  The redacted tape-recording and transcript were presented to the jury during trial...

Appellant said he was good friends with Jennifer and she often allowed him to borrow her car.  He frequently visited her apartment but she usually asked him to leave before her other friends arrived.  Appellant said his last contact with Jennifer started around 10:00 p.m. or 11:00 p.m. on Wednesday, December 20, when she picked him up and drove him to her apartment.  She said that she had to do something because her rent was due and left for several hours.  Appellant stayed by himself, cleaned up the apartment, and watched television.  Jennifer returned around 3:00 a.m. or 4:00 a.m. on Thursday, December 21 and didn't say where she had been.  They watched television and she fell asleep on the sofa.  When she woke up, she asked if he wanted to go home because somebody was going to come over.  Appellant said that he left in Jennifer's car between 9:00 a.m. and 9:30 a.m. on Thursday, and he never saw her again.  He tried to call her several times but she didn't answer the telephone.  On Thursday night, he returned her car with Pat Kinnikin, and he left the key in the vehicle.  Appellant said he didn't know anything about Jennifer's death and he never went onto the patio during his last visit to the apartment.

Detectives Watts and Krueger told appellant they didn't believe his story, that residents in the apartment complex saw him leave from the patio, Jennifer's exact time of death had been scientifically established, and he was in the apartment at the time.  After additional questioning, appellant said he opened the sliding glass door and briefly stepped out on the patio while he was at Jennifer's apartment.  As the interview continued, the detectives again told him that someone saw him leave from the patio.  Appellant then said that after he left with the car on Thursday morning, he returned to the apartment because he forgot something.  No one answered the front door, so he jumped over the patio railing and tapped on the sliding glass door.  No one answered and he left.

Detective Watts advised appellant that Jennifer would have been dead when he returned and the sliding glass door would have been unlocked.  Appellant repeatedly denied that he killed Jennifer or knew anything about her murder.  Watts told appellant they knew he left through the sliding glass door and either he killed Jennifer, or she was dead when he returned through the patio.  Appellant

ed

admitted that when he returned to the apartment, he jumped the patio railing and found the sliding glass door was unlocked.  He entered the apartment and found Jennifer's body on the couch and covered with a blanket.  Appellant said she was bloody and the sofa was soaked with blood.  Appellant said he didn't touch anything and immediately left through the sliding glass door.  He didn't call for help because he was pretty sure that she was dead.  Appellant admitted he left messages on her answering machine, even though he knew she was dead, because he didn't want the police to think that he did it.  He returned her car later that night.

<u>Additional Trial Evidence</u>

On January 9, 2002, police officers executed a search warrant at the residence where appellant lived with his grandmother.  His grandmother had washed appellant's clothes and packed his belongings in boxes in the garage.  The officers seized the boxes and the items were examined.  No blood was found on any of appellant's clothing or shoes.  The criminalist explained that appellant was not arrested on the day of the murder, there was no way to determine what clothes he wore that day, and it was hard to detect blood on clothing that had been washed.

The criminalist testified Jennifer was probably stabbed right on the couch.  The blood on the carpet appeared to have been transferred either by a foot track or a portion of the bloody blanket.  The criminalist couldn't tell if any blood splattered on the assailant.  The blood splatters on the wall were small and appeared to be "cast-off" flung, or projected from a bloody object, possibly from the knife as the victim was being stabbed.  The blood splatters suggested the victim's body was flat on the couch.  The body was covered by two blankets.  One blanket had five or six cuts in it.  The cuts ranged from five-eighths to one and one-half inches long.

Sergeant J.R. Rodriguez of the Kern County Sheriff's Department testified as an expert on the effects of methamphetamine.  Rodriguez testified that among other things, methamphetamine causes a dilation of the pupils, elevates the blood pressure and heart rate, and promotes aggressive, bizarre, violent, and psychotic behavior.

Methamphetamine also causes a person to demonstrate repetitive body movements, rapid speech, and fragmented sentences.

Detective Watts testified appellant wasn't a suspect when they started his interview.  Watts admitted he lied to appellant that the time of death had been scientifically established and witnesses saw him jumping over the patio railing.  Watts didn't know the exact time of death and no witnesses placed appellant on the patio, but Watts made these statements because he wanted to see appellant's reaction.  As the interview progressed, Watts began to believe that appellant wasn't being truthful based on his answers, mannerisms, and certain visual cues.  At one point, appellant began to sink his head very low and lost eye contact with the detectives.  He stopped answering questions and looked at the detectives with a blank stare, but he never cried.

Appellant was rearrested on February 25, 2002. During the booking search, the officers found a small piece of aluminum foil wrapped into a bindle.  The bindle contained 44 milligrams of methamphetamine, which was a usable amount.

<u>Defense Evidence</u>

Appellant did not testify but offered evidence to explain why he had cash on December 20-22, 2001.  Appellant's friend hired him to assemble and move furniture at an oil company in November 2001.  On December 17, 2001, the friend was paid $225 and divided the money with appellant.

Appellant was convicted of second degree murder and possession of methamphetamine.  On appeal, he contends the cord should have excluded the

entirety of his inculpatory statements because he was in custody during the interview.  Appellant also contends the court should have granted his motion for change of venue because of the nature and extent of newspaper articles in The Bakersfield Californian about his pretrial "confession."

**DISCUSSION**

I.  **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after its enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.  **Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C . § 2254(a).

The instant petition is reviewed under the provisions of the AEDPA.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Under the AEDPA, a petition for habeas corpus will not be granted unless the adjudication in question "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining "clearly established Federal law," the Court looks to the "holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

This Court may not issue the writ simply because in its independent judgment the state court decision applied clearly established federal law erroneously or incorrectly; for a writ to issue, 'that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the

states, ninth circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  See Duhaime v. DuCharme, 200 F.3d 597, 600-01 (9th cir. 1999).

AEDPA requires that this court give considerable deference to state court decisions.  The state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).  Moreover, we are bound by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), cert. denied, 537 U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

III.  **Review of Petitioner's Claims**

A.     **Claim One:   Use of Statements Obtained in Violation of _Miranda_ Rights**

In his first claim for relief, Petitioner asserts the trial court erred by permitting the introduction at trial of portions of a transcript made of his initial interview with investigating detectives in the case.  Petitioner asserted that he was not properly advised of his Miranda rights before being subject to custodial interrogation, in violation of his rights under the fifth, sixth and fourteenth Amendments to the United States Constitution.

1.     **Factual Background**

On May 1, 2002,  Petitioner moved to suppress the statements he made during the five-hour interview with the investigating detectives.[3]  Petitioner conceded he was not in custody for the first segment of the interview.  Petitioner argued the nature of the questions became accusatory in the second segment of the interview, at which point he was "in custody" and should have been given _Miranda_ warnings.  The prosecution conceded appellant was being interrogated as of that point, but argued Petitioner was not "in custody" and that therefore _Miranda_ warnings were not required.[4]  Finally, Petitioner argued that he invoked his privilege against self-incrimination and right to remain silent in the last segment of the interview, and his subsequent

---

[3] In considering Petitioner's motion to suppress, the trail court referenced a 111 page transcript of said interview.  All subsequent references to the interview are to this transcript unless otherwise noted.

[4]This segment of the interview contained appellant's admission that he returned to the apartment and found Jennifer's body.

ed

confession that he killed the victim should be excluded.

Petitioner argued the objective factors established he was in custody: Detectives never attempted to question him at home; they never told him he could refuse to go to the police department; once at the police department, he was never told he could leave; Petitioner was placed in a small interrogation room which only unlocked from the outside; Petitioner was questioned for five hours by two detectives; detectives accompanied Petitioner on his cigarette breaks and never left him alone.  Petitioner further argued that when Detective Watts repeatedly accused appellant of killing the victim, he made it objectively reasonable for Petitioner to believe he was not going to be able to leave the police department.

The prosecution argued that the majority of Petitioner's statements were noncustodial. Petitioner volunteered to go to the police department for questioning.  He was not placed in handcuffs.  He was not restrained in the interview room, but left the room for breaks and was given refreshments.  He was advised he was not under arrest; and the tone of the interview was polite and courteous and "not accusatory or confrontational."  The prosecution further argued that Petitioner's questions about leaving were equivocal and not an invocation of his right to remain silent.

On May 14, 15, and 16, 2002, the trial court conducted a hearing on Petitioner's motion to suppress.  Detective Watts was the prosecution's principle witness, and he testified about the manner in which the detectives contacted appellant and their trip to the police department.  He further testified regarding the circumstances of the interview itself.  Watts testified that Petitioner was not suspected of doing anything wrong, but that police wanted to determine if he had any helpful information about the case.  Petitioner was not given his *Miranda* warnings at the beginning of the interview because he was not a suspect, and no evidence placed him at the scene.  Watts testified that information placing him at the scene developed "from [Petitioner] himself during the interview."

Watts testified that after Petitioner was inside the interview room, he could have told the officers he was leaving and walked out of the police department without speaking to anyone. Although the interview lasted five hours, Petitioner never asked to leave.

Watts further testified that during the course of the interview Petitioner asked for and was given water and cigarettes, and was offered soft drinks and coffee as well.  During the first cigarette break, Watts testified that he repeatedly told Petitioner "that he was not under arrest and that he was free to leave."

On cross examination, Detective Watts was asked whether other individuals were questioned in the same manner as appellant.  In particular, Watts was asked whether other individuals were confronted with the accusation that detectives knew they had killed the victim, and if the other interviews were tape-recorded.  Watts indicated that he had asked other individuals whether they killed the victim or had anything to do with her murder.  He believed three of the interviews had been tape-recorded.  No other individual had been questioned for four to five hours, although one prior interview might have been for three hours.  Watts also testified on cross-examination that Petitioner was never left alone during the interview, except when Detective Krueger showed him to the public restroom.

Watts was asked to explain why he told appellant, about one hour into the interview, that there was no doubt he killed the victim.  Watts was asked whether he ever communicated to Petitioner during the interrogation that he was a suspect in the case, and stated that he never used those words until Petitioner was arrested at the end of the interview.

Watts testified that he had conducted a similar interview with Brandy Gentry in an interview at the police department lasting several hours.  During the interview he accused Gentry of killing the victim and of lying.  However, he did not indicate to Gentry that there was no doubt in his mind that she had killed the victim.  Gentry got up and left the police department and stated that the interview was over.

After listening to the tape-recorded interview and hearing the testimony of Detectives Watts and Krueger, the trial court invited argument.  Defense counsel asserted that Petitioner was in custody when Detective Watts plainly stated that he knew Petitioner killed the victim, they had the evidence to prove it, and they just wanted to know why he did it.  The detectives' high-pressure tactics deprived Petitioner of his freedom of movement.  Petitioner was taken to the police station by detectives and was dependent upon them for transportation.  He was never left

alone after the interview began.  He continually asked for permission to take a break.  He was never told he was free to leave.  Two detectives interviewed him for five hours.  The detectives dominated and controlled the interrogation, and repeatedly expressed their belief that he killed the victim.  The detectives were aggressive and confrontational, and used pressure tactics.  Detective Watts' lies about the "evidence" of Petitioner's guilt, while not improper, would make a reasonable person believe that he was in custody and not free to leave.

The prosecutor conceded appellant was interrogated by the detective, but argued that *Miranda* warnings were not necessary because the interrogation was not custodial.  The prosecutor argued that Petitioner was not in custody because he had not been arrested or deprived of his freedom of action in any significant way.  Appellant initiated contact with police and voluntarily agreed to the interview.  Petitioner suggested detectives should conduct the interview at the police department and asked for a ride.  Petitioner was interviewed as an associate rather than a suspect, told he was free to leave, and interviewed in an unlocked room.  He was given cigarette and restroom breaks and provided with water.

On May 20, 2002, the court ruled on Petitioner's motion.  The court granted the motion to suppress with respect to the third part of the transcript (page 89, line 15 through the end).  The court went on to find that, prior to Petitioner's question about self-incrimination, he was not in custody.  A redacted version of the interview transcript which excluded the portion of the interview beyond page 89 line 15 was submitted to the jury.

### 2.    Clearly Settled Supreme Court Law

In <u>Miranda v. Arizona</u>, 384 U.S. 436, the Supreme Court articulated a set of rules police must follow when in situations of custodial interrogation.  The requirement that <u>Miranda</u> warnings be given comes into play when two conditions are met: the individual must be "in custody" and must be subject to "interrogation."  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300 (1980).

For <u>Miranda</u> purposes, a person is "in custody" when he or she is either actually/formally arrested, or where the circumstances amount to the functional equivalent of formal arrest. <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984); <u>California v. Beheler</u>, 463 U.S. 1121, 1125

1  (1983) (ultimate inquiry is whether there was "a formal arrest, or restraint on freedom of

2  movement of the degree associated with formal arrest."). The test for whether a custodial

3  situation exists is objective; the court examines the circumstances surrounding the interrogation

4  to determine whether a reasonable person would feel that he or she was not free to terminate the

5  interrogation and leave. Thompson v. Keohane, 516 U.S. 99, 112 (1995).

6      Detention at a police station normally constitutes "custody." Beheler, 463 U.S. at 1123-

7  25. However, where a person voluntarily enters a police station, or where a reasonable person

8  would feel free to leave the station, a custodial situation does not exist. Id. at 1125.

9  Additionally, the subjective belief of the interviewing officers as to the subject's guilt or

10 innocence is not relevant to the custody inquiry, except to the extent that belief is disclosed to the

11 subject. Stansbury v. California, 511 U.S. 317, 323 (1994).

12     The Ninth Circuit Court has articulated several factors to consider in determining whether

13 a reasonable person would believe that she or he was not free to leave: (1) the language used to

14 summon the individual; (2) the extent to which the individual is confronted with evidence of

15 guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5)

16 the degree of pressure applied to detain the individual. United States v. Kim, 292 F.3d 969, 973

17 (9th Cir. 2002), citing United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001); United States

18 v. Beraun-Panez, 812 F.2d 578, 580 (9th Cir.) modified by 830 F.2d 127 (9th Cir. 1987).

19          **3.      Review by the State Courts**

20     Petitioner's claim was first presented before the Fifth DCA, which rejected said claim in

21 a reasoned opinion on March 26, 2004. At issue for the Fifth DCA was whether the nature and

22 circumstances of the interrogation during the second portion of the interview (beginning on page

23 37) indicated that Petitioner was in custody at that point.

24     The Fifth DCA first articulated the standard for custodial interrogation. First, the person

25 questioned must be in custody. Second, there must be an interrogation. "Custodial

26 interrogation" refers not just to express questioning, but also to words or actions that the police

27 should know are reasonably likely to elicit an incriminating response. Exh. 2 at 52, citing Rhode

28 Island v. Innis, 446 U.S. 291, 301 (1980). But police may question a suspect without violating

Miranda if the suspect is not in custody.

Only the "in custody" element was in dispute.  The Fifth DCA noted the test for whether an individual is in custody is objective.  Id., citing Thompson v. Keohane, 516 U.S. 99, 112 (1995).  The determination involves a two-step inquiry: first, what were the circumstances surrounding the interrogation; second, under the circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.  The ultimate question is whether there was a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.  Id., citing Thomspon, 516 U.S. at 112.  Absent a formal arrest, the relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation."  Id., citing Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

Examining the facts before it, the Fifth DCA found it undisputed that Petitioner voluntarily agreed to be interviewed.  Petitioner was one of several subjects with whom detectives wished to speak because his name and number were found in the victim's cell phone and a paper in her house.  When told detectives were looking for him, Petitioner left a lengthy voicemail message detailing his contact information.  When detectives arrived at Petitioner's home, Petitioner indicated a willingness to talk, and it was Petitioner who first suggested conducting the interview at the police department.  Detectives left without interviewing him.  When they returned later, Petitioner requested a ride and sat in the front passenger seat of an unmarked car, without being restrained in any way.  Detectives wore suits rather than uniforms, and did not display weapons.

During the drive to the police department, Detective Watts advised Petitioner that the interview was voluntary and he was free to leave.  Upon arriving, Petitioner waited in the public lobby while detectives prepared; he was not under supervision or restraint at the time.  When the interview began, the obvious indicia of custody were not present.  Appellant was not formally arrested, frisked, told he could not stop the questioning, told he could not leave, restrained, or handcuffed.  The door to the interview room was not locked, and appellant was not led to believe otherwise.  Petitioner asked for and received refreshment.  Although the interview lasted several hours, Petitioner was given several breaks.

ed

The presence of two officers is not inherently coercive.  Exh. 2 at 55, citing Berkemer v. McCarty, 468 U.S. at 438.  Nor is conducting an interview at the police department, or even in a locked interview room, necessarily custodial.  Id. at 55-56, citing Oregon v. Mathiason, 429 U.S. at 495; California v. Beheler, 463 U.S. at 1125.  Petitioner was told he was free to leave before and during the interview.  He was not restrained or locked in the interview room.  He also agreed to continue the interview after taking cigarette breaks.

The Fifth DCA rejected Petitioner's claim that he was in custody because he had to ask permission to take a cigarette break.  Detective Watts explained there was no smoking permitted in the police department, and arranged a cigarette break on the department roof where employees of the department smoked.  The requests for a cigarette break were not indicative of a desire to terminate the interview, and detectives honored the request.  Informing Petitioner he could not smoke in the interview room was not coercive, and accompanying him to the rooftop during the breaks was reasonable as a matter of internal security; Petitioner was not kept constantly under guard or prevented from leaving the building.  Petitioner was in fact advised during the break that he was free to leave and asked whether he wished to continue.  Petitioner said he would continue to answer questions and returned to the interview room.

While noting that Detective Watts lied to appellant about several aspects of the investigation, the Fifth DCA found that such tactics were not coercive and did not render appellant's statements involuntary.  Id. at 57, citing Illinois v. Perkins, 496 U.S. 292, 297 (1990) (mere strategic deceptions are not coercive).  The court pointed to a wide range of federal and state cases validating the use of deceptive strategies to trick a guilty person into confessing.  Id. at 57-58.

Petitioner argued that he was subject to coercion in the form of the officers' repeated requests that he tell them what happened, their speculation as to whether the homicide occurred in the heat of passion, and their questions as to whether he was being uncooperative.  The Fifth DCA noted that a statement motivated by an express or implied promise of leniency or benefit to the accused is involuntary.  Id. at 58.  However, mere advice by the police that it would be better for the accused to tell the truth, when unaccompanied by either threat or promise, does not render

1  a subsequent confession involuntary.  Id.  Here, the Fifth DCA found that detectives had simply

2  advised Petitioner to tell them the truth, without promising leniency if he did confess or

3  threatening a more severe punishment if he did not.

4      Petitioner further argued he was subject to coercion because detectives repeatedly stated

5  they knew he killed the victim, had the evidence to prove it, and just wanted to know why he did

6  so.  The Fifth DCA noted that an interviewing officer's suspicion, even if manifested to the

7  suspect, is only relevant if it would have affected how a reasonable person in that position would

8  perceive his or her freedom to leave.  Id. at 59, citing Stansbury v. California, 511 U.S. at 323-

9  325.

10     The court acknowledged that accusatory questioning communicates to the suspect that he

11 or she is the focus of the investigation, which is a factor indicating the suspect is in custody.  Id.

12 The court went on to contrast Petitioner's interrogation with those in which a custodial element

13 had been found.  Id. at 61-62, comparing Petitioner's situation with that in People v. Aguilera, 51

14 Cal.App.4th at 1165.  Petitioner was not kept in the interview room for the entirety of the

15 interrogation, and was not prevented from leaving when he requested breaks.  He was told at the

16 beginning of the interview that it was voluntary and he was free to leave, and this advisement

17 was repeated during the cigarette break.  Petitioner was not told he couldn't leave until he told

18 the truth, or until detectives confirmed his alibi.  Thus, the Fifth DCA concluded, although he

19 was subject to accusatory questioning, the totality of the circumstances reflected that he was not

20 in custody during the interview.

21     Citing Brewer v. Williams 430 U.S. 387 (1977) and Rhode Island v. Innis, 446 U.S. 291

22 (YEAR), Petitioner argued that the interview was custodial by virtue of the detectives' coercive

23 methods in their appeals to his morality, references to the anguish of the victim's family, and

24 urges that he do the right thing.  The Fifth DCA noted that neither Brewer nor Innis addressed the

25 in custody issue.  In Brewer, the Court held a detective's deliberate elicitation of an incriminating

26 statement violated the defendant's right to counsel because he was *already in custody* and his

27 Sixth Amendment right to counsel had attached.  Innis held *Miranda* warnings are not required

28 when a suspect is simply taken into custody, but only where he or she is subject to interrogation.

The Fifth DCA then addressed Petitioner's argument that under <u>United States v. Heldt</u>, 745 F.2d 1275 (9th Cir. 1984) it is coercive and custodial for police to exhort a suspect by asking the same questions repeatedly.  The Fifth DCA found, however, that the issue in <u>Heldt</u> was distinct.  In <u>Heldt</u>, the defendant was asked to sign a waiver-of-rights form.  Despite his refusal to comply, officers continued to ask him questions and defendant repeatedly said he did not want to answer further questions.  The Ninth Circuit held the interrogation was improper because defendant's refusal to sign the form indicated that he did not waive his *Miranda* right to silence. Exh. XX at 63, citing <u>Heldt</u>, 745 F.2d at 1277-1278.

Petitioner further cited to <u>Orozco v. Texas</u>, 394 U.S. 324 (1969) in support of his assertion that his interrogation was custodial.  The Fifth DCA distinguished <u>Orozco</u> on the basis that the case did not address whether the defendant would reasonably have felt free to leave or ask to leave, but instead relied on officers' testimony that the defendant was under arrest and not free to leave.

Finally, the Fifth DCA noted that Petitioner's reliance on <u>Couch v. United States</u>, 409 U.S. 322 (1973), and <u>Curcio v. United States</u>, 354 U.S. 118 (1957) was misplaced.  <u>Couch</u> holds that the Fifth Amendment privilege against self-incrimination attaches to the person, not to information that may incriminate him (in that case, records the defendant was forced to surrender to the Internal Revenue Service).  <u>Curcio</u> held that, in the context of a criminal contempt proceeding, forcing the custodian to testify orally as to the whereabouts of unproduced records requires him to disclose the contents of his own mind, contrary to the Fifth Amendment.  Neither situation was found to be pertinent to Petitioner.

Having determined that, despite the accusatory questioning used by the detectives in interviewing Petitioner, under the totality of the circumstances Petitioner was not in custody when he made the inculpatory statements admitted by the trial court.  Thus the Fifth DCA upheld the decision of the trial court to admit these statements.

### **4.    Analysis of Petitioner's Claim**

This Court finds that the decision of the Fifth DCA was not contrary to nor an unreasonable application of clearly settled Supreme Court law.

First, the circumstances under which Petitioner was summoned to the interview support the Fifth DCA's determination that Petitioner was not "in custody."  Petitioner was one of several individuals detectives wished to speak with concerning the murder by virtue of his name and number being found in the victim's cell phone.  Detective Watts testified that Petitioner was not a suspect either at the time his name was found or at the time the interview began.  After several failed attempts by Detectives to reach Petitioner, Petitioner himself initiated conversation with the detectives, leaving a voicemail for Detective Watts detailing his contact information and stating  "I will be happy to answer any questions you have," and "I hope to hear from you soon."  When the detectives arrived at Petitioner's residence to interview him, Petitioner reiterated his willingness to talk, and it was Petitioner who suggested conducting the interview at the police department.  At the time, not only did detectives not detain Petitioner, but they in fact left to pursue a different investigation.  Upon returning, Petitioner was driven to the police station by the detectives, but this too was at his request.  The vehicle used for transport was unmarked.  Petitioner sat in the front passenger seat without being restrained in any way, nor were the detectives in uniform or displaying weapons.  Detective Watts testified that during the drive he advised Petitioner that the interview was voluntary and that he was free to leave.

Nor do the physical surroundings of the interrogation indicate that Petitioner was in custody.  Upon arriving, Petitioner was left unattended in the public lobby of the police department while detectives prepared for the interview.  He was not formally arrested, frisked, restrained, or told he could not leave or stop the questioning.  Petitioner was interviewed in a room containing a lock accessible only from the exterior, as well as equipment for attaching restraints.  However, while in the interview room the door was not locked and Petitioner was not restrained.  Petitioner asked for and received both breaks and refreshments.  Petitioner was accompanied on his cigarette breaks.  However, the detectives testified he was accompanied for internal security reasons rather than as a custodial technique.

Petitioner's interview took place over several hours.  Length of detention is a factor considered by courts in determining whether an interrogation is custodial.  United States v. Kim, 292 F.3d at 973.  However, a lengthy interrogation is not necessarily rendered custodial for

Miranda purposes.  As noted above, Petitioner asked for and was given breaks in questioning, and Detective Watts testified that during those breaks Petitioner was again advised that the interview was voluntary and that he was free to leave.

Without question some of the circumstances are more indicative of a custodial setting. Petitioner was confronted with two detectives who used deceptive tactics to illicit damaging statements.  As the Fifth DCA notes, however, using deception to trick a guilty person into confessing is a valid interrogatory technique, and such tactics are not necessarily coercive.  Exh. 2 at 57, *citing* Perkins, 496 U.S. at 297.

The detectives interviewing Petitioner also used accusatory questioning, communicating to him their belief that he was guilty of the crime.  Such communication is a factor indicating that a suspect is in custody.  Stansbury, 511 U.S. at 323-325.  However, the presence of coercive elements does not necessarily create a custodial situation.  Id. at 54, citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977); California v. Beheler, 463 U.S. at 1123-1125.  The Fifth DCA found that the circumstances of Petitioner's interrogation were distinct from those in which courts had found interrogation to be custodial.  Despite the accusatory nature of the questioning, Petitioner was given breaks, and informed during those breaks that the interview was voluntary and that he was free to leave.  Detective Watts testified that when using similarly accusatory interview techniques with another witness, Brandy Gentry, the witness got up and left the police department, declaring the interview to be over.

The Fifth DCA determined that the totality of the circumstances did not indicate that the disputed portion of  Petitioner's interrogation was custodial.  This Court finds that the determination of the Fifth DCA is not contrary to or unreasonable in light of settled Supreme Court precedent.  Petitioner's claim should be denied.

**B.      Claim Two:   Denial of Petitioner's Venue Change Motion**

In his second claim for relief, Petitioner contends the trial court's denial of his motion for a change of venue violated his Sixth and Fourteenth Amendment rights to a fair trial.

**1.      Factual Background**

On or about April 26, 2002, Petitioner filed a motion for change of venue from Kern

County.  The motion was supported by eight articles from The Bakersfield Californian and public comments from the newspaper's Internet chat room.  On May 2, 2002, the prosecutor filed opposition to Petitioner's motion.

On May 13, 2002, the scheduled first day of trial, the court considered Petitioner's motion for a change of venue.  Defense counsel argued Petitioner could not receive a fair trial in Kern County because of the extent and nature of print and broadcast media stories about this case.  Defense counsel asserted the media reports, particularly the articles in The Bakersfield Californian, presented appellant as someone who had already confessed to the murder.  The articles repeatedly referred to appellant's "confession" that he stabbed and killed the victim with a knife, and that the court had previously "thrown out" the confession and dismissed the murder charge.  After the court partially excluded the pretrial statements, the newspaper stories used the word "confession" in "virtually every article that talks about him from there on."  When the district attorney's office refiled the murder charge against appellant, the newspaper stories again stated that appellant's "confession" had previously been excluded because it was involuntary, but appellant revealed in his "confession" that he stabbed the victim and discarded the knife.

Defense counsel argued the jury pool in Kern County had been tainted by the print and broadcast media stories.  The defense had not commissioned a poll to determine the existence of such a taint because it was too expensive.  Instead, defense counsel relied on postings on The Bakersfield Californian's website and "chat room," and argued such postings reflected the public's attitude toward appellant's case.  The postings indicated the community's "outrage" regarding the earlier dismissal of the murder charge and exclusion of the "confession."  Defense counsel cited particular comments in the newspaper's "chat room" about appellant's "confession," that the "slug gets away with murder," the "scum bag got off" just because "someone screwed up," the police "screwed up and set a murderer free."  Defense counsel asserted the postings reflected the public's assumption and belief that appellant was guilty.  Counsel queried: "Where do they get this assumption from?  Must be from the media.  I doubt if anyone ever talked to any of the people involved in this case."  Counsel argued the chat room postings were "powerful blows against the presumption of innocence that just the repetition of

ed

the word confession, confession, suppression of confession."

Defense counsel argued the "whole tenor" of the chat room postings was that appellant was guilty and "justice may have been served in a constitutional [sense], but justice was not served in a real [sense] because obviously he's guilty and he got away with it.  And they call him all these dirty names."  Counsel conceded the postings were from "a select part of the community, that is those people who are interested enough to go into the internet and comment on the article, but that is some indication."  However, counsel argued the postings "should be considered as a reflection on the population of our county as a whole; although, I will admit that this is a select sample.  It is a sample and it's all that we have."

Defense counsel noted the standard for granting a change of venue motion was whether there was a reasonable likelihood that a defendant cannot receive a fair trial.  There were several factors to consider, and counsel conceded the pretrial publicity had not been "excessive" when compared to similar cases, but "the quality and particulars of the information" were unusually damaging against appellant.  Counsel argued that an individual's unconscious biases and their initial impressions could not be revealed during voir dire, and a potential juror could be completely honest and deny any prejudice but still be affected by the pretrial publicity.  Counsel argued the trial should be moved from Kern County because of the "nature of the media coverage about a confession and everybody knows he's guilty and the outrage of the public in that the confession has been thrown out."

The prosecutor objected to appellant's reliance on the chat room postings as inadmissible hearsay.  Such comments were from people in the community "who have nothing better to do with their time than sit and chat about the case," and some of the postings were repetitive.  The prosecutor conceded that some of the people who contributed to the chat room might be potential jurors, but there was no evidentiary foundation to consider the hearsay postings.  Defense counsel replied the postings were not being submitted for the truth of the matter therein, but simply to reflect the public's comments about the case.

The court was concerned about the reliability of the contents of the chat room postings.  Defense counsel explained that he copied the postings off the Internet and printed the comments,

and the postings were being submitted for the nonhearsay purpose of reflecting the community's attitudes about the case.

The prosecutor argued the nature of the coverage hadn't been voluminous, and neither appellant nor the victim were prominent members of the community.  In addition, the size of Kern County did not support the motion because there had never been a change of venue ordered out of the county.  The offense was a homicide but it wasn't a capital case.  The nature of the offense did not involve anything "that's so graphic that it would ... automatically weigh on the side of ... a change of venue"

The prosecutor agreed with defense counsel that the only potential factor to support change of venue was the nature of the news coverage.  "And all we really have is the fact that there has been some coverage" that appellant gave "a confession, admission in terms of his involvement in these offenses."  The prosecutor suggested the court and the parties could determine the impact of these stories during jury selection.

The prosecutor examined the postings submitted by appellant, and noted the identities of the individuals who entered the comments in the chat room.  The postings were done by 10 people, including a deputy public defender and a local attorney.  The prosecutor argued the court should not rely "on the comments of ten people who logged onto the internet and in a day or two thereafter the confession was suppressed."  The postings were not a good gauge of the community's opinions, and were not relevant to the nature of public opinion.

The prosecutor suggested the court had three alternatives in considering the venue motion.  First, the prosecutor argued the court should deny the motion because appellant failed to carry his burden to establish the fie prerequisites for a change of venue.  There were only a few articles in the local newspaper about the case, and the chat room postings were not indicative of the community's opinions.  Second, the prosecutor suggested the court defer ruling on the venue motion until it considered appellant's motion to exclude his pretrial statements.  If the court found all of appellant's statements were admissible, the pretrial publicity issues would be rendered irrelevant because the jury would hear all of appellant's statements and there would be nothing to speculate about.  Third, the prosecutor suggested that even if the court excluded all or

a part of appellant's pretrial statements, it could delay the venue ruling until it conducted jury

selection.  The court and the parties could determine through the jury questionnaire and voir dire

whether the potential jurors were aware of the news stories and whether the stories affected their

opinions about the case.

Defense counsel agreed the court's ruling on the Miranda issue might affect the venue motion,

but the jurors might still believe that some portions of appellant's statements were being

excluded based on the nature of the newspaper articles.  Defense counsel also conceded all five

factors to change venue were not present in this case, but argued that one factor alone – the

nature of the coverage – was sufficient to move the case.  The nature of the media stories were

"the heart of the matter" because the presumption of innocence had been reversed.  It was "very

rare" to have a confession thrown out and then retry the case.  In addition, the nature of the

homicide was sufficiently grave because the victim had been stabbed 31 times.

The court acknowledged that appellant's venue motion had some merit, but decided to

defer ruling on it until it considered appellant's motion to suppress his pretrial statements and

conducted jury selection.  The court believed it could determine the impact of the news coverage

by using a questionnaire which asked the potential jurors to disclose their familiarity with the

media stories and their thoughts about the case.  The court was determined to ensure appellant

received a fair trial but believed the venue motion should be delayed until it considered the other

issues in the case.  Defense counsel admitted the court's ruling was reasonable and that jury

selection would present the court with more information to assess the validity of the venue

motion.

On May 17, 2002, the court turned to jury selection and extensively consulted with the

parties about the jury questionnaire.  The court also discussed the appropriate procedure to

conduct voir dire to avoid contamination of the panel by any potential jurors who were aware of

the pretrial publicity.

On May 20, 2002, the court distributed the two-page questionnaire to the members of the

jury pool to complete and return to the court before jury selection began.  The court advised the

potential jurors there had been media coverage about the case, and asked them to indicate what

they had heard or knew about the case.

The court conducted jury selection on May 20, 23, 28, 29, 30, 31, and June 3, 2002.  Each prospective juror was asked to complete the jury questionnaire . Based on their responses to the questionnaire, the prospective jurors were individually questioned in private about their knowledge of the case and the extent of their pretrial media exposure.  In addition, each prospective juror was subject to questioning during general voir dire.

During the course of jury selection, the court repeatedly admonished the prospective jurors to avoid any media coverage of the trial, and to avoid reading The Bakersfield Californian.

Defense counsel specifically requested a jury panel which did not include any residents of the City of Bakersfield.  The court suggested using the entire county as a source, which would reduce but not eliminate the number of Bakersfield residents in the potential jury pool.  Defense counsel requested a panel from the entire county because the pretrial publicity was worse in Bakersfield than in other areas of the county.  The prosecutor concurred with defense counsel's request.

Jury selection began with 154 prospective jurors; 42 were dismissed for hardship and six were dismissed for cause, leaving 106 potential jurors.  Of the 106 remaining, there were 15 who never heard about the case and 91 who heard or knew about the case.  Of the 15 who had never heard about the case, four were excused by the defense through peremptory challenges, and five were excused by the court.

Of the 91 who had heard or knew about the case, 41 were excused for cause (actual bias), 13 were excused by the defense's peremptory challenges, nine were excused by the prosecution's peremptory challenges, and eight were excused for other reasons.

The final jury pool consisted of five jurors who had never heard about the case, and seven who had some knowledge of the case.

On June 3, 2002, the court again considered Petitioner's motion for change of venue.  The court denied Petitioner's motion:

> "I think the proof's in the pudding as indicated by earlier comment that we have what would appear to be a very responsible group of jurors.  We have sorted them out.  We have cleared with them by the questionnaire that was prepared by both counsel involved in that questionnaire a direct, excuse me, assault on anybody's

28

ed

thoughts as it might relate to the media coverage.

"And I think that that has been pretty well covered and that we have now a jury which can make a decision without having any impact on any of the media coverage in this case.  And, therefore, the motion is denied as it relates to change of venue."

### 2.    Clearly Settled Supreme Court Law

The Sixth Amendment guarantees a criminal defendant a fair trial by "a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).  A defendant's change of venue motion must be granted when prejudicial pretrial publicity makes empaneling an impartial jury impossible.  Gallego v. McDaniel, 124 F.3d 1065, 1070 (9th Cir. 1997).  While they must be impartial, there is no requirement that jurors be wholly ignorant of the facts of the case.  Irvin, 366 U.S. at 722.  The Sixth Amendment requires instead that jurors set aside their pretrial opinions, and reach a verdict based on the evidence produced during trial.  United States v. Dischner, 974 F.2d 1502, 1525 (9th Cir. 1992).

A petitioner's is entitled to relief by virtue of excessive or unfair publicity when he or she can demonstrate either that prejudice should be presumed or that actual prejudice existed.  Hart v. Stagner, 935 F.2d 1007, 1014 (9th Cir. 1991); Richarson v. Newland, 342 F.Supp.2d 900, 913 (E.D. Cal. 2004).  Prejudice is presumed only in extreme circumstances, where the record demonstrates a venue "saturated with prejudicial and inflammatory publicity."  Richardson, 342 F.Supp.2d at 913.  Actual prejudice is found "if the jurors demonstrated actual partiality or hostility, or where the amount of publicity creates "community-wide sentiment against the defendant, such that the jurors' claim that they can be impartial should not be believed.".  Id.

For purposes of Habeas Corpus review, this Court makes an independent review of the record.  Richardson, 342 F.Supp.2d at 913.

### 3.    State Court Review

Petitioner's claim was first presented to the Fifth DCA, which denied the claim in an unpublished opinion on March 30, 2004.  The court first addressed the applicable standard for change of venue motions.  Under California law, a change of venue is appropriate where the defendant demonstrates a reasonable likelihood that in the absence of such relief, he cannot obtain a fair trial.  Op. at 79, citing Cal. Pen. Code § 1033, subd. (a); People v. Navarette, 30

Cal.4th 458, 484 (2003); People v. Jennings, 53 Cal.3d 334, 359 (1991).  The burden of proof is on defendant.  Id.  The trial court looks to the following factors: the nature and gravity of the offense, the size of the community, the status of the defendant, the popularity and prominence of the victim, and the nature and extent of the publicity.  Id., citing People v. Maury, 30 Cal.4th at 389; People v. Navarette, 30 Cal.4th at 484.  On appeal, the appellant must prove it was reasonably likely a fair trial could not be had, and in addition must demonstrate actual prejudice.  Id.

The Fifth DCA then examined Petitioner's case in light of these factors.  With regard to the nature and seriousness of the offense, the court noted that Petitioner was charged with the serious offense of first degree murder, but found that a murder charge alone did not generally warrant a venue change.  Id. at 80.  The investigation and details of the offense attracted media attention, but this is true of most murders.  Id.  In addition, the Fifth DCA found the case lacked "sensational overtones" typically requiring a change of venue, such as an ongoing crime spree, multiple victims, or sexual motivation.  Id.  Nor was the nature of the killing itself sensational in comparison to other murder cases involving change of venue motions.  Id.

Turning to the size of the community, the appellate court noted a number of California Supreme Court decisions in which the size of Kern County was found not to weigh in favor of a venue change.  Id. at 80-81 (collecting cases).  In Petitioner's case, the prosecution stated without contradiction that the daily circulation of The Bakersfield Californian was 74,000, with a Sunday circulation of 87,526.  The court compared these figures with the 2000 census reported population of Kern County (661,645), and the population of Bakersfield (247,057) and found that the size of the factor did not weigh in favor of changing venue.

With regards to the status of Petitioner and the victim, the Fifth DCA noted that neither individual was well-known or prominent in the community, and "nothing in their status was calculated to engender unusual emotion in the community."  Id. at 82, quoting People v. Balderas, 41 Cal.3d at 17; People v. Staten, 24 Cal.4th 434, 449 (2000).   Media descriptions of both Petitioner and victim were mixed.  Petitioner's prior arrests for theft, fraud, and child endangerment were noted, but so too was his lack of violent history and that he was the victim's

1   "best friend."  The victim was described as "well-liked" and a successful high school athlete;

2   however the media also focused on her "dangerous lifestyle" including drug use, stealing, and

3   alleged participation in an escort and stripping service.  The Fifth DCA found that the media's

4   description of both victim and Petitioner was "essentially neutral."  Id.

5         Finally, the Fifth DCA turned to the nature and extent of the publicity, which was the

6   primary factor in Petitioner's venue motion.  Petitioner's motion was based on a series of eight

7   articles published in The Bakersfield Californian.  These articles described his arrest and

8   confession, the court's suppression of the confession, the dismissal of charges against Petitioner,

9   and the district attorney's decision to rearrest and refile the murder charge against Petitioner.

10  Defense counsel advised the court of two additional articles prior to the trial court's ruling on the

11  venue motion.

12        The Fifth DCA found that the newspaper articles were "neither extensive or

13  inflammatory."   Id. at 82.  The articles factually addressed the investigation and appellant's

14  arrest.  Victim was portrayed both positively and negatively, and Petitioner was noted for being

15  her best friend.  The number of articles in question were minimal in comparison to other cases in

16  which no venue change was deemed necessary.  Id., citing People v. Cummings, 4 Cal.4th 1233,

17  1275, n. 16 (no venue change despite 51 newspaper articles and 24 television reports).

18        Petitioner asserted the media coverage continued throughout the trial.  However, the Fifth

19  DCA found that Petitioner did not present evidence that media organizations actually covered the

20  trial and/or published or broadcast additional stories about the case.  Moreover, the Fifth DCA

21  noted that the motion for change of venue was based on the eight articles referenced in the

22  original motion and the two further articles read into the record by defense counsel prior to the

23  trial court's ruling on the venue motion.  Only one further passing reference was made to

24  additional media coverage prior to the trial court's ruling, and defense counsel acknowledged at

25  the conclusion of voir dire that publicity had subsided during jury selection.  Id. at 83.

26        The Fifth DCA noted that Petitioner did not commission a poll or survey to determine the

27  impact of the media coverage on the public, but instead relied on internet chat room postings

28  about the case on the newspaper's website.  The court found that the internet postings in question

were "extremely limited in their nature and scope," and that "their limited authorship and dissemination cannot be considered indicative of how residents of Kern County felt about the case." Id. at 84.

Finally, the Fifth DCA addressed Petitioner's contention that the nature of the articles – which repeatedly referenced his "confession" and recited key details from his police interview – reversed the presumption of innocence. The Fifth DCA found that the jury selection process applied by the trial court effectively alleviated this concern. The court extensively consulted with the parties about the contents of the jury questionnaire. Id. at 84-85. Prospective jurors were required to reveal their prior media exposure and were questioned privately about their responses. The court and parties also questioned prospective jurors about their media exposure during voir dire. Id. at 85. Of the empaneled jurors, five had never heard about the case, and seven had some prior knowledge of the case. Noting that defense counsel had not exercised all of his peremptory challenges, the Fifth DCA stated "The failure to exhaust peremptories is a strong indication "that the jurors were fair, and that the defense itself so concluded.'" Id. quoting People v. Dennis, 17 Cal.4th at 524.

The Fifth DCA concluded that Petitioner's motion for a change of venue was properly denied, and affirmed the judgment of the trial court.

### 4.    Analysis of Petitioner's Claim

Based on the record before it, this Court finds that Petitioner's motion for a change of venue was properly denied. We agree with the Fifth DCA that the ten newspaper articles presented by Petitioner in making his motion "were fairly factual." Ex. 2 at 82-83. The articles portrayed the victim both positively and negatively, and noted that Petitioner was the victim's 'best friend.' Ex. 2 at 82. Comparing the daily circulation of The Bakersfield Californian to the population of Kern County further supports the determination of the Fifth DCA, as does the trial court's efforts to reduce the number of potential jurors from the city of Bakersfield. Ex. 2 at 81.

Nor are the internet chat room postings presented by Petitioner demonstrative of the level of prejudice necessitating a change of venue. These postings were limited both in authorship and dissemination, and are not an adequate demonstration of how residents of Kern County felt about

the case.

Additionally, the trial court went to significant lengths to reduce the impact of media exposure on the trial, screening potential jurors with a questionnaire, private questioning about their responses to said questionnaire, and further questions during voir dire. Ex. 2 at 85. Defense counsel was able to participate in the formulation of the questionnaire, and had an opportunity during voir dire to question jurors regarding their level of media exposure and possible resulting bias. The final composition of the jury consisted of five individuals who had never heard about the case, and defense counsel did not exercise all of his peremptory challenges. Ex. 2 at 85.

The record does not reflect an "atmosphere in the community or courtroom" that denied Petitioner his right to a fair and impartial jury trial in Kern County. Murphy v. Florida, 421 U.S. 794, 799 (1975). Nor is there any demonstration in the record of actual prejudice. As a result, Petitioner's claim should be denied.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED and the Clerk of the Court be DIRECTED to enter judgment.

These Findings and Recommendations are submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(c). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Y1st, 951 F.2d 1153 (9th Cir. 1991).

1    IT IS SO ORDERED.

2    **Dated:      January 3, 2008**                              **/s/ John M. Dixon**
                                                          UNITED STATES MAGISTRATE JUDGE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ed                                       34